Robin STRICKLAND, Plaintiff–Appellant,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant–Appellee.

No. 03–2143.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 28, 2004.

Decided Aug. 19, 2004.

Barry A. Schultz, Evanston, IL, for Plaintiff–Appellant.

Yvette S. Sanders, Social Security Administration, Office of the General Counsel, Chicago, IL, for Defendant–Appellee.

Before MANION, DIANE P. WOOD, and EVANS, Circuit Judges.

ORDER

Robin Strickland has not worked since 1994. Before that time she worked as an assistant manager, an assembly supervisor, a home attendant, and an administrative clerk. In 1998 she applied for disability insurance benefits and supplemental security income benefits, alleging that she was unable to work because of pain related to migraine headaches, fibromyalgia, and reflex sympathetic dystrophy (RSD). After her application was denied initially and on appeal, she requested and received a hearing before an ALJ. The ALJ found that Strickland suffered from severe impairments that prohibited her from performing her past relevant work, but that she retained the capacity to perform other occupations within the regional economy and was therefore not entitled to benefits. The district court subsequently affirmed the Commissioner's denial of benefits. Because the ALJ did not give adequate reasons for rejecting the opinion of the physician who treated Strickland for her migraines, we vacate and remand.

At the hearing before the ALJ, Strickland testified about migraine headaches that occurred as often as four times a

week—even when she was taking medication. When she had a migraine, she explained, she experienced extreme sensitivity to any light and sound and often could not leave her bed for days at a time. Records from emergency room visits in 1998 and 1999 confirmed that she sought urgent relief from her migraines. Other medical records from 1995 to 1999 showed that her doctors had prescribed a variety of pain medications for her migraines on at least four occasions. Doctors at the Mayo Clinic, as well as Strickland's local gynecologist, related the migraines to her menstrual cycle. Strickland even took the drastic measure of seeking relief by undergoing a hysterectomy in 1996. Unfortunately, the headaches did not improve after the procedure, and Strickland testified that within a few months the headaches became more frequent and more severe.

Strickland's testimony about the migraine pain she experienced was consistent with the pain she reported during examinations to her gynecologist, Dr. Steven Stenzel, who treated Strickland for her migraines from 1995–98. In a residual functional capacity assessment completed in March 1999 in support of Strickland's claim for disability benefits, Dr. Stenzel concluded that Strickland suffered from frequent, severe migraines. He opined that the headaches could occur up to 20 days per month and would keep her from work at least 4 days a month.

Neurologist Loren Rolak saw Strickland in 1998 and 1999, after her doctor who was treating her fibromyalgia referred her to him to determine if the headaches had a neurological source. Dr. Rolak performed neurological screening tests and ruled out a neurological basis for her headaches. He did not dispute, however, that Strickland suffered from severe migraines, and found that even with pain medication, "it

will be difficult to completely control her headaches."

Strickland also testified that she suffered from RSD—a nerve disorder characterized by burning pain, tissue swelling, and extreme sensitivity to touch—and fibromyalgia—a chronic condition associated with widespread muscle and soft tissue pain, tenderness, and fatigue. Strickland explained that the RSD caused stiffness, cramping and sensitivity to touch in her right foot, right leg, and left foot. Her fibromyalgia, Strickland testified, caused constant moderate pain and stiffness in her elbows, hands, knees, hips, shoulders and back, and prohibited her from any lifting and from performing tasks that require any strength, such as opening a factory sealed jar. Strickland's descriptions of pain and physical limitations were confirmed by her treating physicians, surgeon Peter Ihle and rheumatologist David Bjarnason, who each reported that Strickland suffered from constant, moderate pain. Dr. Bjarnason stated that Strickland could sit or stand continuously for only 15 minutes, must walk for 5 minutes every 15 minutes and could occasionally lift 10 lbs but never 20 lbs. Dr. Ihle stated that as a result of Strickland's RSD, she could sit or stand for only 15 minutes at a time, she could sit, stand, or walk for only 2 hours out of an eight-hour day, she would need unscheduled breaks to elevate her legs every 15 minutes for 5–10 minutes, and she could only occasionally lift 15 lbs. Ihle and Bjarnason independently concluded that Strickland could not work full-time because she would have to be absent from any job at least four times a month.

In contrast, Drs. Bussan and McDermott, consulting physicians to the SSA, opined that Strickland's descriptions of pain severity were "out of proportion" to the medical evidence in the record. They noted that Strickland's medical history showed that she walked without a limp and

had "no physical limitations." They found no objective evidence in the record to support a diagnosis of RSD, an observation that Dr. Rolak also made after reviewing Strickland's medical record. The consulting physicians did recognize there was "a probable diagnosis of fibromyalgia," but stated that Strickland's physical examinations, both by Dr. Bjarnason and by the SSA-contracted examining physician Dr. Thomas Lingen, showed that she had normal strength and range of motion in her joints.

A vocational expert also testified before the ALJ, and opined that a person suffering from Strickland's ailments would still be able to perform a number of jobs in the regional economy. According to the vocational expert, someone impaired by RSD, migraines, fibromyalgia, depression and chronic pain, who is on a number of medications and is limited to lifting 10 lbs. only occasionally, would still be able to work in visual inspection, security surveillance, and telemarketing. However, when asked by Strickland's counsel whether a person missing over two days per month due to unexcused illness could perform the occupations identified, the vocational expert answered that such a person could not.

In her ruling, the ALJ considered the requisite five-step framework for determining benefit eligibility. The ALJ concluded that Strickland had not been gainfully employed since her claimed disability began (step one); that her combined impairments were "severe" (step two); and that even though the impairments were not included in the Listed Impairments set forth at Appendix I, Subpart P, Regulations No. 4 (step three), Strickland lacked the residual functional capacity to perform her past relevant work as a supervisor, a home attendant, or an administrative clerk. (step four). *See* 20 C.F.R. §§ 404.1520(a)(4)(I)-(iv), 416.920(a)(4)(I)-(iv). At step five, however, the ALJ determined that despite Strickland's severe impairments and inability to perform her past work, she could perform a significant number of other jobs in the regional economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). Specifically, the ALJ found that Strickland retained the residual functional capacity for lifting and carrying only 10 lbs. occasionally and 5 lbs. frequently, that she could stand for no more than 4 hours a day, that she required a sit/stand option, and that because of her pain (and depression related to the pain) she had difficulty concentrating and focusing. At the same time, the ALJ decided not to credit Strickland's testimony regarding her inability to work full-time or to accord controlling weight to her treating physicians' opinions—each of whom concluded that Strickland could not engage in full-time work. Ultimately, the ALJ found that the opinions of Strickland and her physicians regarding her inability to work full-time were contrary to other evidence in the record.

We review the ALJ's conclusions deferentially, upholding the decision if reached under the correct legal standard and supported by substantial evidence. *Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir.2003). An ALJ's findings are supported by substantial evidence if they identify supporting evidence in the record and adequately discuss the issues. *Id.* An ALJ must also give controlling weight to a treating physician's opinion regarding the severity of a medical condition if the opinion is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *see Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003).

■ On appeal, Strickland argues that the ALJ did not give adequate reasons for rejecting the opinions of Dr. Stenzel, the doctor most familiar with Strickland's migraines. We agree. The ALJ discredited

Dr. Stenzel's opinion because Dr. Stenzel is a gynecologist and not a neurologist. But nothing in the record supports the ALJ's conclusion that gynecologists as a group do not have expertise about migraines. Strickland's migraines were diagnosed by doctors at the Mayo clinic and by Dr. Stenzel as related to her menstrual cycle, and it follows that a gynecologist would be the proper specialist to work with her. See also "Migraine Headache," McKinley Health Center, Student Affairs/University of Illinois at Urbana–Champaign, http://www.mckinley.uiuc.edu /health-info/dis-cond/headache/migr-hea. html (noting that migraines are triggered by "monthly periods, birth control pills, estrogen therapy"). Dr. Stenzel treated Strickland from 1995–98, the time period relevant to her claim for benefits, and his findings are supported by Strickland's own testimony concerning the effects of the migraines on her daily life, as well as by other evidence in the record, including emergency room visits and her decision to undergo a hysterectomy. Moreover, no doctor on record disputes Dr. Stenzel's diagnosis that Strickland suffered from severe migraines.

The ALJ also appears to have thought, incorrectly, that the neurological test results somehow undercut Strickland's claims that her migraines are severely painful. In fact, nothing in the record suggests that these tests can confirm either the existence of migraines or their likely severity. If anything, Dr. Rolak's conclusion that Strickland suffered from severe migraines even in the face of the normal test results shows that there are no diagnostic tests that work particularly well for migraines. The ALJ's decision to discredit Dr. Stenzel's opinion, without citing any inconsistencies in the record and without acknowledging that substantial evidence supports the doctor's opinion, was in error. See Gudgel, 345 F.3d at 470. We reverse on that basis.

Less persuasive are Strickland's arguments that the opinions of treating physicians' Dr. Ihle and Dr. Bjarnason should have been given controlling weight. The ALJ's findings of Strickland's ability to lift weight, her ability to sit and stand for long periods of time, and her ability to focus all mirrored the treating doctors' conclusions. As the ALJ noted in her ruling, the only conclusion that she rejected, that Strickland's physical limitations arising from her RSD and fibromyalgia prohibited her from full-time work, was inconsistent with the opinions of the vocational expert and the SSA physicians. Accordingly, substantial evidence supports the ALJ's decision to discredit Strickland and her treating physicians' opinions regarding the effects of her fibromyalgia and RSD.

For the reasons stated above, the judgment of the district court is vacated and the matter is remanded to the Social Security Administration for reconsideration.

VACATED AND REMANDED.